**HANCOCK v. SMITH.**

Civ. No. 228.

United States District Court
W. D. Virginia, Danville Division.

April 7, 1950.

Edwin B. Meade, of Danville, Va., for plaintiff.

Rutledge C. Clement, of Danville, Va., and G. Neil Daniels, Greensboro, N. C., for defendant.

BARKSDALE, District Judge.

This action having been tried upon the facts by the Court without a jury, on March 14, 1950, the Court does hereby find the facts and states separately its conclusions of law as follows:

### Findings of Fact.

This action was instituted by Vivian H. Hancock of Danville, Virginia, as assignee of her deceased husband, Samuel E. Hancock, against Harvey J. Smith of Greensboro, N. C. The amount in controversy, exclusive of interest and costs, is in excess of $3,000.00.

During the Spring and Summer of 1943, Samuel E. Hancock was employed as Division Chief of the United States Bureau of Internal Revenue, stationed at Danville. Defendant Harvey J. Smith, and Ira W. Barker, were also employed as Deputy Collectors of the Bureau of Internal Revenue and were also stationed at Danville, under the supervision of S. E. Hancock. The three men were friends, but it was the duty of Hancock to periodically report on the efficiency of Smith and Barker, and he was definitely the boss. On and prior to July 29, 1943, Smith owned an undivided thirty-three-and-one-third percent interest and Barker owned an undivided sixty-six-and-two-thirds percent interest in certain United States patents covering an oil display cabinet, Smith having been the inventor. At the same time, Smith and Barker jointly owned certain United States patents covering a bottle vending machine. Prior to July 29, 1943, conversations had been had between Hancock, Smith and Barker in regard to the purchase by Hancock of an interest, both in the patents covering the vending machine, and the patents covering the oil display cabinet. The three men had verbally agreed that, for $50.00 cash, Smith would sell Hancock a ten percent interest in the vending machine patents, and for $30.00 cash, Barker would sell Hancock a six-and-two-thirds interest in the oil display cabinet patents. At that time, no vending machines or oil display cabinets were being manufactured under these patents.

On July 29, 1943, Hancock called Smith and Barker from the office which they occupied jointly, into his office, and told them that he had gotten the contracts ready, and that if they met with the approval of Smith and Barker, he was ready to close the deal. Hancock handed the contract relating to the vending machine patents to Smith, and the contract relating to the oil display cabinet patents to Barker, for their approval and signature. Hancock had not himself signed

either contract. One contract was upon the stationery of a lawyer, and the other was substantially identical with it, with the exception of the names of the parties and the numbers of the patents. Mrs. Hawkins, Hancock's secretary, was in Hancock's office when Smith and Barker came in. While they were reading the contracts, Hancock called in Walter K. Hardy, another agent of the Bureau of Internal Revenue, and told him he wished him to witness the signatures to the contracts. Smith and Barker each read and signed the contract to which he was a party, Hardy then signed both contracts as a witness and handed them to Mrs. Hawkins, who also signed as a witness and handed both contracts to Hancock. Hancock then placed both contracts in his drawer, without signing them himself. Barker asked Hancock for the cash consideration which had been agreed upon, to which Hancock replied, "Boys, I am a little short on cash. I will have to see you later." Barker replied, "That wasn't the agreement. You were supposed to pay at the time the contracts were signed", to which Hancock replied, "I don't have the money now and you have signed the contracts so that is all that is necessary." Hancock retained the contracts, and Smith and Barker returned to their office. The contract here in controversy, which Barker signed on July 29, 1943, and which Hancock later signed, is as follows:

"This Agreement, made this 29th day of July, 1943, by and between W. Ira Barker, party of the first part and S. E. Hancock, party of the second part;

### Witnesseth

That for and in consideration of the sum of One ($1.00) Dollar paid to the said party of the first part by the said party of the second part, and other good and valuable considerations, receipt of all of which is hereby acknowledged, said party of the first part does hereby sell to the said party of the second part a six and two-thirds percent (6-⅔%) interest in and to a certain display cabinet owned by the said party of the first part and other interested parties, which said cabinet is patented under the following patent numbers: No. 132151 and No. 2320159, and the following serial number: No. 482442, and on which there is now pending application for a further patent, which application was dated April 9, 1943.

The said party of the first part further covenants and agrees that the said party of the second part is to share to the extent of six and two-thirds percent (6-⅔%) in all profits and royalties arising from the sale, rental, use or transfer of any or all of such display cases as are mentioned herein, or in any other cases of a similar nature owned by the said party of the first part.

The said party of the second part agrees and covenants that he will not sell or assign his rights herein without the consent of the said party of the first part.

Witness the following signatures and seals:

W. Ira Barker (Seal)
S. E. Hancock (Seal)

Elgie L. Hawkins
Witness
Walter K. Hardy
Witness."

After Smith and Barker had returned to their office, they discussed what they should do in view of the fact that Hancock had declined to pay the cash consideration agreed upon. After several days, they decided they would write Hancock a letter, and on August 10, 1943, they wrote the following letter:

"August 10, 1943

"Mr. S. E. Hancock,
Danville, Virginia.
"Dear Sir:
"On the 29th day of July, 1943, we, the undersigned gentlemen, agreed to enter into a contract with you whereby we were to sell you certain interests in patent rights owned by us. You had your Attorney, the Honorable Maitland H. Bustard (State Senator and Tax Evasion Consultant) write these contracts and presented them to us for our signatures. We assume upon execution of the contracts the consideration as agreed upon would be passed over to us, as is the usual procedure when dealing with gentlemen. However, after we signed the

contracts you grabbed the damn things and placed same in your desk drawer and stated that you were a little short of funds at that time but would let us have a check in a few days.

"In view of the fact that you did not pay us upon execution of the contract and at this writing we still have not received your check, we do hereby consider the contract null, void and without effect now, henceforth and forevermore. Amen.

"Respectfully,"

Smith and Barker sent this letter to Hancock by registered mail, with the request that a return receipt be mailed to Steve McIntire, a fictitious person, whose address was given as Smith's post office box at Danville. Smith and Barker used the fictitious name of Steve McIntire because they apprehended that if Hancock knew the registered letter was from them, he would refuse to accept it. Shortly afterwards, Hancock, Smith and Barker went to Virginia Beach, where they remained for several days on official business. On August 21, 1943, Hancock called Smith and Barker into his room and told them that he had received their registered letter, and that, after thinking it over, he had decided that the vending machine proposition was the best of the two, and he would like to go through with that contract, and Smith not objecting, Hancock wrote a check payable to Smith in the sum of fifty dollars, and gave it to him. Smith later cashed this check for fifty dollars, retained the money, and there has never been any question about the validity of this contract relating to the vending machine patent. After handing the check to Smith, Hancock turned to Barker and told him that when he got back to the office he would tear up the paper which Barker had signed. After their return to Danville, Barker asked Hancock whether he had torn up the oil display cabinet contract, and Hancock told him that he had destroyed it.

Back in 1941, Smith, Barker, and a Mr. Cobb who then owned an interest in the patents, entered into a partnership under the name, "Modern Metal Products Company", for the manufacture and sale of the oil display cabinets. Later, Mr. Cobb re-tired from the partnership, and a Mr. Mayo became a partner. Subsequently, Mr. Mayo sold his interest in the patents to Smith and Barker and retired from the partnership. The partnership continued until February, 1947, when Smith bought Barker's interest in the patents, and Barker retired from the partnership. In October, 1947, a corporation was formed as "Modern Metal Products, Inc.", which was the successor of the former partnership. Hancock was never a partner in the partnership known as "Modern Metal Products Company", nor was any stock in the successor corporation ever issued to him.

No oil display cabinets were manufactured by Smith and Barker, or Modern Metal Products Company, after July 29, 1943, until 1946, when some 700 or 800 were manufactured by a contractor and sold by the partnership. No substantial profits were realized from the sale of the oil display cabinets during 1946. In 1947, oil display cabinets were manufactured and sold, and profit was realized. The business prospered, and in 1948 substantial profit was realized. Profits were divided in accordance with the Modern Metal Products Company partnership agreement. No profit was ever paid to Hancock, nor did he ever assert any right to profits.

On February 17, 1947, Smith wrote Hancock a letter advising that he had bought from Barker his "entire one-half interest in the Oil Display Cabinet patents and the Modern Metal Products Company", and had sold to Barker all his interest in the vending machine patents. Smith further said, "Now that I am alone in the Oil Display Cabinet business, my time will be pretty well taken up." Hancock made no claim to any interest in the oil display cabinet business, nor is there any evidence that he replied at all.

In January, 1946, S. E. Hancock suffered a stroke and was hospitalized for a few weeks. However, he went back to work prior to March 15, 1946. In February, 1947, Hancock suffered a second stroke, and was hospitalized for several weeks, but went back to work on March 10, 1947. Hancock again suffered a stroke on April 21, 1947. After that, his condition grew progressively worse until he died on

June 18, 1948. In September, 1947, Hancock was adjudicated incompetent and committed to a state institution at Staunton, and the American National Bank of Danville qualified as his Committee. However, Hancock did not approve of his commitment, and after a week or two, it was terminated, in early October, 1947, when he returned to his home from the institution at Staunton.

While acting as Hancock's Committee, the American National Bank, through its trust officer, found the two contracts, bearing date July 29, 1943, in regard to the vending machine patents and the oil display cabinet patents, and Mr. Ragland, Trust Officer of the Bank, inquired of Smith and Barker as to the validity and value of these contracts. Smith and Barker promptly informed him that the vending machine contract was valid, but that the oil display cabinet contract had never been valid, and showed Ragland their copy of the letter of August 10, 1943, set out herein.

Plaintiff, Mrs. Hancock, testified that on Hancock's return from the institution at Staunton in October 1947, he inquired: "Where are my papers and all of my things," to which she replied, "I had to carry them to the American National Bank. Judge Leigh appointed them committee, and they ordered me to bring them all of your private personal papers of any value and I carried them over." Then Hancock inquired, "Did you find two contract agreements I had there between Smith and Barker and myself?", to which she replied that she did, and that they were at the bank. Then Hancock said, "You be very careful with my papers. I don't want anything to happen to them." This vague reference is the only testimony as to any mention which Hancock ever made of the contract here in controversy.

There is no evidence that Hancock ever made any inquiry about, or showed any interest in, the manufacture or sale of the oil display cabinets. Hancock never paid the agreed consideration of thirty dollars for his proposed purchase of a six-and-two-thirds-percent interest in the oil display cabinet patents, or any part thereof. Although Hancock was never a well man

after suffering the stroke in January, 1946, he continued to go to his office whenever he was able, and was still actively in the employment of the Government as Division Chief, Bureau of Internal Revenue, at Danville, at the time of his death.

Conclusions of Law.

Diversity of citizenship being present and the amount in controversy being more than $3,000.00, I find that this Court has jurisdiction of this action.

From the facts found above, I conclude that the alleged contract, which is the basis of this action, was never a valid contract. Delivery was essential to the binding effect of this proposed contract, and delivery depends upon the intention of the parties as well as the physical facts. Whitaker v. Lane, 128 Va. 317, 343, 104 S.E. 252, 11 A.L.R. 1157; Coal River Colliery Co. v. Eureka Coal & Wood Co., 144 Va. 263, 281, 132 S.E. 337, 46 A.L.R. 485; 17 C.J. Secundum, Contracts, § 64, p. 414. Parol evidence is admissible on the question of delivery of a written instrument complete on its face. Harris v. Sanford, 148 Va. 181, 138 S.E. 465, 54 A.L.R. 699; Nottingham v. Farmers & Merchants Trust Bank, 170 Va. 291, 299, 196 S.E. 634.

From the facts found, I conclude that Barker did not intend to deliver the proposed contract to Hancock without contemporaneously receiving the thirty-dollar cash consideration previously agreed upon, and that he did not deliver it. Therefore, I find that there was no such delivery as to render the contract valid.

Counsel for plaintiff urges that Section 8-286, Code of Virginia 1950 (formerly Section 6209), entitles plaintiff to a recovery, because under the statute Smith is an adverse party, Barker an interested party, and their testimony lacks the corroboration required by the statute. The statute is as follows:

"Section 8-286. Corroboration required and evidence receivable when one party incapable of testifying.

"In an action or suit by or against a person who, from any cause, is incapable of

testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony; and in any such action or suit, if such adverse party testifies, all entries, memoranda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence."

I agree that Smith is an adverse party and Barker an interested party, but it is my conclusion that the testimony of Smith and Barker is entirely credible and amply corroborated.

"Section 6209 of the Code does not require the testimony of an adverse witness to be corroborated in every particular. The statute only requires that there should be such corroboration as would confirm and strengthen the testimony of such adverse witness." Rorer v. Taylor, 182 Va. 49, 53, 27 S.E.2d 923, 925. See also Timberlake's Adm'r v. Pugh, 158 Va. 397, 402, 403, 163 S.E. 402; Noland Co. v. Wagner, 153 Va. 254, 149 S.E. 478; Shenandoah Valley Nat. Bank v. Lineburg, 179 Va. 734, 20 S.E.2d 541.

Without undertaking to point out all corroborative testimony, I conclude that the testimony of Smith and Barker is corroborated as to the occurrences at the signing of the contract in Hancock's office on July 29, 1943, by the testimony of Mrs. Hawkins and Hardy. Further corroboration is furnished by the carbon copy of Smith's and Barker's letter to Hancock of August 10, 1943, and the receipt for this registered letter signed by Hancock. Hancock's check of fifty dollars to Smith dated September 21, 1943, and the absence of any check to Barker on or near that date, are corroborative of Smith's and Barker's testimony of their conversation with Hancock on that date. The fact that there is no evidence of any payment at any time of any cash by Hancock to Barker, is also corroborative.

It is to be noted that, as an exception to the hearsay rule of exclusion, Section 8-286 of the Code provides that in the situation here presented, "all entries, memoranda, and declarations by" Hancock during his lifetime, were admissible in support of plaintiff's contentions. Notwithstanding this wide latitude given to her, plaintiff produced nothing except her own testimony of the vague inquiry set out in my findings of fact. It is inconceivable to me that if Hancock had, or thought he had, any interest in the oil display cabinet business, he would not have made some declaration or memorandum about it, when he must have known that they were being manufactured in 1946, 1947 and 1948, and that the business was growing increasingly prosperous. This is particularly true in the light of the fact that by letter of February 19, 1947, Smith wrote Hancock that he had sold all his interest in the vending machine patents to Barker and that he was "alone in the oil display cabinet business."

Since I have reached the conclusion that the alleged contract upon which plaintiff's claim is grounded, was never a valid contract, an order will be entered dismissing plaintiff's action, without reaching for consideration, defendant's contention that plaintiff would not be entitled to recover anything even if the contract should be held valid.